# In the United States Court of Federal Claims

### Nos. 15-103C; 15-518C
### Filed: March 15, 2016

| | |
|---|---|
| * * * * * * * * * * * * * * * * * | * |
| | * |
| **LAKE BORGNE BASIN LEVEE DISTRICT and ST. BERNARD PARISH GOVERNMENT,** | * Motion to Dismiss; Statute of Limitations; 28 U.S.C. § 2501; Breach of Contract; Attorney's Fees; Indemnity Contract; State Court Proceedings. |
| **Plaintiffs,** | * |
| **v.** | * |
| **UNITED STATES,** | * |
| **Defendant.** | * |
| * * * * * * * * * * * * * * * * * | * |

**Robert E. Couhig**, Couhig Partners, LLC, New Orleans, LA, for the plaintiffs. With him was **Jason A. Cavignac**, Couhig Partners, LLC, New Orleans, LA. Of counsel was **Thomas P. Anzelmo**, McCranie, Sistrunk, et al., New Orleans, LA. Of counsel in case number 15-518C was **William M. McGoey**, St. Bernard Parish Government, Chalmette, LA.

**Vincent D. Phillips,** Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for the defendant. With him were **Robert E. Kirschman, Jr.**, Director, and **Benjamin C. Mizer**, Principal Deputy Assistant Attorney General, Commercial Litigation Branch, Civil Division, Washington, D.C., and **Maurya Kilroy**, Assistant District Counsel, United States Army Corps of Engineers, New Orleans, LA.

## O P I N I O N

<u>**HORN, J.**</u>

### FINDINGS OF FACT

In the two above-captioned cases, plaintiffs Lake Borgne Basin Levee District (Lake Borgne) and St. Bernard Parish Government (St. Bernard) allege breach of contract by, or, in the alternative, the existence of an indemnity agreement with, defendant United States, acting through the United States Army Corps of Engineers (Army Corps). Plaintiff St. Bernard is a political subdivision of the State of Louisiana, organized and existing under the laws of the State of Louisiana and with its principal place of business in St. Bernard Parish, Louisiana. Plaintiff Lake Borgne is a political subdivision of the State of Louisiana charged with the duty of overseeing and maintaining flood protection authorities in St. Bernard Parish.

The alleged contract at issue in the above captioned cases concerns the repair of certain levees (the LPV Levees) in St. Bernard Parish that are part of the Hurricane/Shore Protection Project for Lake Pontchartrain, Louisiana and Vicinity (the HSPP or the HSP Project), which levees were damaged by Hurricane Katrina. The construction of the HSPP was authorized by the Flood Control Act of 1965, based on the recommendations of the Secretary of the Army. See Pub. L. No. 89-298 (Oct. 27, 1965). Subsequent to the passage of the Flood Control Act of 1965, on August 16, 1966, St. Bernard and Lake Borgne signed an "Act of Assurance" (the 1966 Act of Assurance) in which the plaintiffs "assure[d] the Secretary of the Army of the United States" that they were "authorized and empowered to comply with all the required conditions of local cooperation" for the portions of the HSPP located in St. Bernard Parish. In particular, the plaintiffs stated that they would "jointly and severally, without cost to the United States . . . [p]rovide all lands, easements, and rights-of-way, including borrow and spoil-disposal areas necessary for construction, operation, and maintenance of the project." The 1966 Act of Assurance signed by both St. Bernard and Lake Borgne states that it was executed in accordance with two separate resolutions adopted by St. Bernard and Lake Borgne on August 16, 1966 and August 15, 1966, respectively. In both the August 16, 1966 and August 15, 1966 resolutions, plaintiffs state that their respective executives are "authorized, empowered and directed . . . to acquire and make available, without cost to the United States, all lands, easements, and rights-of-way for that portion of the [HSP] project located in the Parish of St. Bernard."

On April 11, 1967, June 6, 1967, and May 13, 1969, Lake Borgne adopted three additional resolutions appropriating interests in lands the Army Corps had requested as necessary for construction of the LPV Levees. In the first resolution, adopted April 11, 1967, Lake Borgne "appropriated" certain "levee rights of way and temporary soil easements for construction" of the LPV Levees requested by the Army Corps. The first resolution stated that the temporary spoil easement was to be used as a "temporary ponding area." In the second resolution, adopted June 6, 1967, Lake Borgne "appropriated" an "additional landside right of way for levy purposes" requested by the Army Corps. In the third resolution, adopted May 13, 1969, Lake Borgne "appropriated" certain "levee rights of way and temporary spoil easements for construction" of the LPV Levees requested by the Army Corps. Each of the resolutions also granted a right of entry to the Army Corps to the property appropriated and stated that the appropriations were made "without cost to the United States."

On February 15, 1977, St. Bernard, Lake Borgne, and the Army Corps jointly executed an "Agreement between the United States of America and the Board of Commissioners of the Lake Borgne Basin Levee District and the St. Bernard Parish Police Jury for the Lake Pontchartrain and Vicinity, Louisiana Project." (The 1977 Agreement). The 1977 Agreement was subsequently approved by the Secretary of the Army on December 7, 1977. The 1977 Agreement stated that St. Bernard and Lake Borgne "agree that they will, without cost to the United States . . . [p]rovide all lands, easements, and rights-of-way, including borrow and spoil-disposal areas necessary for construction, operation, and maintenance of the [HSP] project." The 1977 Agreement also stated that two additional resolutions, one adopted by St. Bernard on January 13, 1976 and the other adopted by Lake Borgne on April 20, 1976, were "annexed hereto and made a part hereof"

the 1977 Agreement. In the January 13, 1976 and April 20, 1976 resolutions, both of which were attached to the 1977 Agreement, St. Bernard and Lake Borgne each stated, in identical language, that it "agrees that it will, without cost to the United States . . . [p]rovide all lands, easements, and rights-of-way, including borrow and spoil-disposal areas necessary for construction, operation, and maintenance of the [HSP] project."

On August 29, 2005, Hurricane Katrina struck the Gulf Coast, resulting in considerable damage to the LPV Levees in St. Bernard. On September 1, 2005, Henry Rodriguez, Jr., President of St. Bernard, issued an Executive Order exercising his emergency powers under the Louisiana Homeland Security and Emergency Assistance and Disaster Act, La. Stat. Ann. § 29:721, et seq. Among the powers the Louisiana Homeland Security and Emergency Assistance and Disaster Act granted to parish presidents such as Mr. Rodriguez was the power to, "[s]ubject to any applicable requirements for compensation, commandeer or utilize any private property if he finds this necessary to cope with the local disaster." La. Rev. Stat. Ann. 29:727(F)(4) (2015).[1]

On September 19, 2005, the Army Corps sent a letter to Lake Borgne proposing to perform repairs to a portion of the LPV Levees located in St. Bernard. The September 19, 2005 letter stated:

> This LPV [Levee] repair work will require considerable earthen borrow material. A potential source for this material has been identified as a 200 foot-wide strip of land along the levee between the Bayou Bienvenue Control Structure and the southeast corner of the hurricane protection levee (Station 1007+91). This area which is described as a 300-ft long strip of land measured from the edge of the existing levee right-of-way is shown on the enclosed map entitled "St. Bernard Borrow Area." The top five (5) feet of this material will be removed and wasted as it is unsuitable for levee construction. The material will be obtained by excavating the material to a depth of no more than an additional 15 feet.

The September 19, 2005 letter continued with a request for a right of entry to the area it had identified, stating:

> By this letter we are requesting your right of entry, including ingress and egress, to the 300-feet by 200-feet borrow area, as shown on the map entitled, "St. Bernard Borrow Area," and along the hurricane protection levee from station 270+00 (Highway 510 Bridge) to station 1137+58 (Highway 46 crossing) to perform repairs to the portion of the levee located between stations 390+00 and 1054+00. This right of entry is required as soon as

---

[1] The current version of the statute differs from the version in effect in 2005, notably by adding subsection I and renaming the "Military Department, office of homeland security and emergency preparedness" as the "Governor's Office of Homeland Security and Emergency Preparedness." Subsection F, cited above, however, remains unchanged in the two versions.

possible, but no later than September 21, 2005 and should remain valid until completion of construction.

The September 19, 2005 letter included a copy of an Executive Order passed by Jefferson Parish, Louisiana "granting the Parish President authority to commander or utilize private property during a local disaster without permission of the property owner" and requested that, "[s]hould St. Bernard Parish find it necessary to pass a similar resolution in order to accommodate this request," Lake Borgne should include a copy of the resolution with its right of entry.

Pursuant to this request by the Army Corps, on September 29, 2005, St. Bernard President Rodriguez issued an order entitled "Commandeering Property and Granting Irrevocable Right of Entry for Borrow, Access, and Construction (Repair and Rehabilitation) of the Lake Pontchartrain Louisiana  and Vicinity Hurricane Protection Levee, St. Bernard Parish" (the Commandeering Order), in which he used his emergency powers, in accordance with his September 1, 2005 Executive Order, to "commandeer the use of certain private immovable property" the same property requested in the Army Corps' September 19, 2005 letter, in order "to obtain borrow materials, gain access, and construct (repair and rehabilitate) the Lake Pontchartrain Louisiana and Vicinity Hurricane Protection Levee in St. Bernard Parish." The Commandeering Order further "tender[ed] and grant[ed] an irrevocable right of entry to these lands to the Lake Borgne Basin Levee District," and stated that Lake Borgne would follow suit by tendering an "Authorization for Entry" to the Army Corps to enter these properties "to repair and rehabilitate said levee."

On September 30, 2005, Lake Borgne issued an "AUTHORIZATION FOR ENTRY FOR BORROW, ACCESS, and CONSTRUCTION (Repair and Rehabilitation)" (the Authorization for Entry) (capitalization in original), which stated that Lake Borgne had "acquired the real property interests required by the Department of the Army as requested via letter dated September 19, 2005" and that Lake Borgne was "otherwise vested with sufficient title and interest in lands, to support repair and rehabilitation of the Lake Ponchartrain Louisiana and Vicinity, Hurricane Protection Levee in its jurisdiction." Lake Borgne further "authorize[d] the Department of the Army, its agents, employees, and contractors to enter upon these lands to obtain borrow, access, and construct (repair and rehabilitate) said levee" according to the Army Corps' official plans.

On October 2, 2005, Lake Borgne, St. Bernard, and the Army Corps executed a "Cooperation Agreement," which established the parties' respective rights and obligations pertaining to the repair and rehabilitation of the LPV Levees. The October 2, 2005 Cooperation Agreement required plaintiffs to "provide all lands, easements and rights-of-way, including suitable borrow and dredged or excavated material disposal areas . . . determined by the Government to be necessary for construction, operation, and maintenance of the Rehabilitation Effort and the HSPP." On October 4, 2005, however, St. Bernard President Rodriguez submitted a "written request for rehabilitation assistance" to the Army Corps, requesting that the federal government assume responsibility for the "acquisition or funding . . . of newly-acquired lands, easements,

rights-of-way, relocations, and disposal areas"[2] commandeered by St. Bernard. The following day, on October 5, 2005, Lake Borgne followed suit with a nearly identical request. Subsequent to these requests for rehabilitation assistance, on October 7, 2005, Steven L. Stockton, the Army Corps' Deputy Director of Civil Works, submitted a formal memorandum to the Assistant Secretary of the Army for Civil Works recommending certain one-time policy deviations from Army Corps policies with respect to the post-Katrina rehabilitation efforts in New Orleans. On October 10, 2005, Mr. Stockton issued a Memorandum for Record stating that John Paul Woodley, the Assistant Secretary of the Army for Civil Works, had given verbal approval for certain policy deviations, including a waiver from the Army Corps' general policy requiring that local project sponsors such as plaintiffs provide all lands, easements, rights of way and disposal or borrow areas at no cost to the federal government.

Following the approval of these deviations, on October 17, 2005, Lake Borgne, St. Bernard, and the Army Corps executed "Amendment No. 1, Cooperation Agreement" (the Amended Cooperation Agreement), which rescinded and replaced the October 2, 2005 Cooperation Agreement. The Amended Cooperation Agreement begins with an acknowledgement that the HSPP was built by the federal government pursuant to the Flood Control Act of 1965, and is "governed by the Agreements of Local Assurance dated August 16, 1966 and February 15, 1977 . . . which remain in full effect." The Amended Cooperation Agreement refers to the Department of the Army as the "Government," as represented by the Army Corps, and St. Bernard and Lake Borgne as the "Public Sponsors." The obligations of the parties are spelled out in Article II of the Amended Cooperation Agreement, titled "OBLIGATIONS OF THE GOVERNMENT AND PUBLIC SPONSOR." (capitalization in original). Article II.B of the Amended Cooperation Agreement states:

> As further specified in Article III, the Public Sponsors shall provide right of entry to all lands, easements, and rights-of-way, including suitable borrow and dredged or excavated material disposal areas, determined by the Government to be necessary for construction, operation, and maintenance of the Rehabilitation Effort[3] and the HSPP.

---

[2] The Requests for Assistance refers to the "newly-acquired lands, easements, rights-of-way, relocations, and disposal areas" as "LERRDs."

[3] Article I.A of the Amended Cooperation Agreement defines the "Rehabilitation Effort" as:

> [T]he repair and rehabilitation of damaged areas and the replacement of particular features of that portion of the Lake Ponchartrain and Vicinity, Louisiana Project, Chalmette Area Plan that lies within St. Bernard Parish Louisiana to the authorized level of design protection, including over build, as appropriate, as constructed prior to the 2005 hurricane event, in accordance with the project authority therefor, as generally described in the "Project Information Report, Pl. 84-99, Rehabilitation of Damaged Flood Control Works, Lake Pontchartrain, La And Vicinity Hurricane Protection

Article II.B.1 states, in relevant part:

> As further specified in Article III, after receiving the Public Sponsors' right of entry to the lands, easements, and rights of way, including suitable borrow and dredged or excavated material disposal areas (LERD) that are described in Article III.A.2. and III.A.3. of this Amendment, the Government, subject to the availability of appropriations, shall identify and pay just compensation to the owners of a compensable interest in the LERD described in Article III.A.2 of this Amendment.

Article III of the Amended Cooperation Agreement specifies the process to be used by the parties in fulfilling their obligations related to LERD under Article II, stating, in relevant part:

> A. The Government shall provide the Public Sponsors with a description of the anticipated real estate requirements and relocations for the Rehabilitation Effort. Thereafter, the Public Sponsors shall, at no cost to the Government provide right of entry, to all lands, easements, and rights-of-way, including suitable borrow and dredged or excavated material disposal areas (hereinafter LERD) as may be determined by the Government in that description, or in any subsequent description, to be necessary for the construction, operation, and maintenance of the Project and the Rehabilitation Effort, in the manner hereinafter discussed.
>
> 1. The Public Sponsors shall provide right of entry to all LERD that they own, claim or control (hereinafter Public Sponsor LERD) in a manner that is free and clear of any liens, defects of title, or encumbrances, including the release or subordination to the Rehabilitation Effort of any third party interests, as determined by the Government to be necessary for the construction, operation and maintenance of the Rehabilitation Effort;
>
> 2. The Public Sponsors shall use their best efforts to provide right of entry to LERD that any other non-Federal governmental entity owns, claims, or controls (hereinafter Other Non-Federal Governmental LERD) in a manner that is free and clear of any liens, detects of title, or encumbrances, including the release or subordination to the Rehabilitation Effort of any third party interests within such LERD as determined by the Government to be necessary for the construction, operation and maintenance of the Rehabilitation Effort; and
>
> 3. The Public Sponsors shall provide right of entry to all other LERD not owned, claimed, or controlled by the Public Sponsors or Other Non-

_____

Project, Chalmette Area Plan, St. Bernard and Orleans Parishes, La", prepared by the District Engineer, U.S. Army Engineer District, New Orleans, dated October 1, 2005.

Federal Governmental Entities (hereinafter Private LERD as follows):

    a. The Public Sponsors shall secure or cause to be secured an executive commandeering order or orders from the President of St. Bernard Parish, Louisiana, which said order or orders shall commandeer Private LERD, in accordance with powers set forth in La. R.S. 29:721, et seq., including all privately owned third party interests, as determined by the Government to be necessary for the construction, operation and maintenance of the Rehabilitation Effort;

    b. In the event that the commandeering official is not the presiding official of the Public Sponsors, the Public Sponsors must secure a right of entry from the commandeering official to the Private LERD described in the Commandeering Order or Orders; and

    c. The Public Sponsors shall tender a right of entry to the Government for the Private LERD.

. . .

B. The Government shall perform such relocations as it determines to be necessary for the construction, operation, and maintenance of the Rehabilitation Effort. In addition, the Government in the name of the Public Sponsors, identify [sic] and provide [sic] just compensation to the owners of a compensable interest in the Private LERD and shall acquire the requisite interests in the non-Federal Governmental LERD to which the Public Sponsors, despite their its [sic] best efforts, was [sic] unable to obtain a free and unencumbered right of entry . . . .

    1. The Government shall obtain a deed or servitude agreement, as appropriate, in the name of the Public Sponsors, for those interests described in the Commandeering Order or Orders referenced in Paragraph A.3.a. of this Article . . . .

    2. Where the Government is unable to obtain free and unencumbered title on the behalf of the Public Sponsors or to reach an agreement with the interest owners in the Private and Other Non-Federal Governmental LERD, the Government shall obtain such interests, in the name of the United States of America, through the exercise of its eminent domain authority.

The final provision of the Amended Cooperation Agreement relevant to the above-captioned cases is Article V which states in full: "The Public Sponsors shall not be entitled to receive a credit or reimbursement for any costs incurred by the Public Sponsors hereunder."

Plaintiffs in the above-captioned cases allege that, among the property interests that were commandeered by St. Bernard in its September 29, 2005 Commandeering Order, and for which Lake Borgne subsequently provided a right of entry to the Army Corps in its September 30, 2005 Authorization for Entry, were properties owned by Borgnemouth Realty Company, Ltd. (Borgnemouth) and Olivier Plantation, LLC, Park Investments, Ltd., and Morning Park, Inc. (the Olivier Plantation landowners). Plaintiffs further allege that "[s]oon after the [Army] Corps was granted access to the property identified in the Commandeering Order, the [Army] Corps, through its contractors, excavated borrow material" from the Borgnemouth and the Olivier Plantation landowners' properties. The plaintiffs allege:

> The Corps solely determined the borrow areas required to repair the levees and requested a right of entry to this specific property. The Corps prepared the plans and specifications governing the project, and neither St. Bernard nor the [Lake Borgne Basin] Levee District were involved in the process. The Corps made all operational decisions on the project. St. Bernard and the Levee District did not excavate or participate in the excavation of borrow material . . . .

On May 18, 2007, the Olivier Plantation landowners filed a complaint against St. Bernard and Lake Borgne in Louisiana state court, demanding just compensation for 590,086 cubic yards of borrow material allegedly removed by the Army Corps from their property pursuant to St. Bernard's September 29, 2005 Commandeering Order and Lake Borgne's September 30, 2005 Authorization for Entry. See Olivier Plantation, LLC, Park Invs., Ltd., and Morning Park, Inc. v. Parish of St. Bernard, Lake Borgne Basin Levee District, 34th Judicial District Court, St. Bernard Parish, Dkt. 109-272. (May 18, 2007) (the Olivier Plantation case). On May 18, 2009, St. Bernard filed a third-party demand against the Army Corps, and on May 19, 2009, the case was removed to the United States District Court for the Eastern District of Louisiana (the District Court) at the request of the Army Corps. On September 23, 2010, the District Court severed and remanded to the state court the Olivier Plantation landowners' claims against St. Bernard and Lake Borgne on the grounds that it lacked jurisdiction to hear them. See Olivier Plantation, LLC v. St. Bernard Parish, 744 F. Supp. 2d 575, 584, 589-90 (E.D. La. 2010). The District Court also dismissed and declined to transfer to the United States Court of Federal Claims St. Bernard's third-party claims against the Army Corps, on the grounds that, although the Court of Federal Claims would be the proper venue, the claims were premature and ultimately depended on the resolution of the Olivier Plantation landowners' suits against St. Bernard and Lake Borgne. See id. at 588-89. Thereafter, the Louisiana state trial court, in an amended judgment dated March 20, 2012, found St. Bernard and Lake Borgne liable, jointly and severally, for compensation in the amount of $2,449,930.00,[4] and, on November 9, 2012, awarded the Olivier Plantation landowners an additional $832,318.65 in attorney's fees and costs. The Louisiana Court of Appeals affirmed the judgment on October 30, 2014. See Olivier Plantation, L.L.C. v. Parish of St. Bernard, 151 So. 3d 965

---

[4] The amended judgment of March 20, 2012 corrected the prior judgment of January 17, 2012, which had incorrectly stated, due to a mathematical error, that the amount of compensation due to the private landowners was $2,045,430.00.

(La. Ct. App. 2014). On February 27, 2015, the Louisiana Supreme Court denied St. Bernard and Lake Borgne's writs for review. See Olivier Plantation, L.L.C. v. Parish of St. Bernard, 160 So. 3d 173 (La. 2015). Plaintiffs allege that, on March 23, 2015, the Olivier Plantation landowners petitioned the Louisiana state trial court for a writ of mandamus, seeking to compel St. Bernard and Lake Borgne to satisfy the judgment against them. Plaintiffs further allege that St. Bernard and Lake Borgne have paid $50,500.00 each to the Olivier Plantation landowners "in return for a forbearance agreement whereby the Landowners have agreed to delay their mandamus proceedings against Plaintiffs" until the resolution of case number 15-518C filed in this court.

A similar suit was filed against St. Bernard and Lake Borgne by Borgnemouth in Louisiana state court on November 13, 2008, seeking compensation for 248,296 cubic yards of borrow material allegedly removed from its property by the Army Corps pursuant to St. Bernard's September 29, 2005 Commandeering Order and the Lake Borgne's September 30, 2005 Authorization for Entry. On June 20, 2013,[5] the Louisiana state trial court entered a judgment holding St. Bernard and Lake Borgne liable, jointly and severally, for compensation in the amount of $1,241,480.00, plus attorney's fees of $335,370.00, interest, and court costs. See Borgnemouth Realty Co., Ltd. v. Parish of St. Bernard, 34th Judicial District Court, St. Bernard Parish, Dkt. 112-833 (Nov. 13, 2008) (the Borgnemouth case). The judgment was affirmed by the Louisiana Court of Appeals on May 21, 2014. See Borgnemouth Realty Co., Ltd. v. Parish of St. Bernard, 141 So. 3d 891 (La. Ct. App. 2014). On September 26, 2014, the Louisiana Supreme Court denied St. Bernard and Lake Borgne's writs for review. See Borgnemouth Realty Co., Ltd. v. Parish of St. Bernard, 149 So. 3d 266 (La. 2014). Plaintiffs allege that, on November 7, 2014, Borgnemouth petitioned the Louisiana state trial court for a writ of mandamus, seeking to compel St. Bernard and Lake Borgne to satisfy the judgment. St. Bernard and Lake Borgne further allege that they paid Borgnemouth $100,000.00 each to forestall execution of the judgment until the resolution of case number 15-103C filed in this court.

On February 3, 2015, Lake Borgne filed a complaint in the United States Court of Federal Claims, case number 15-103C, concerning the judgment in the Borgnemouth case. In the complaint, Lake Borgne alleges that defendant's failure to compensate Borgnemouth for the losses Borgnemouth sustained as a result of the Army Corps' entry onto and excavation of borrow material from its property constitutes a breach of the Amended Cooperation Agreement. In particular, Lake Borgne alleges that Article II.B.1 and/or Article III.B of the Amended Cooperation Agreement, which discuss the obligations of the parties regarding Private LERD, required the Army Corps to compensate the Borgnemouth for the losses it sustained. Lake Borgne also alleges, in the alternative, that "the language in the Amended Cooperation Agreement constitutes an agreement to

---

[5] The court notes that the parties' Joint Stipulation of Facts states that the state trial court judgment was entered in the Borgnemouth case on June 18, 2012, but it appears from the order submitted as an exhibit to filings in this court that the judgment was entered on June 20, 2013.

indemnify" St. Bernard and Lake Borgne. [6] The complaint seeks to require the defendant to "to pay all amounts owed to Borgnemouth in satisfaction of the Louisiana State Court Judgment," including the attorney's fees awarded to Borgnemouth and the accumulating interest. Further, in the alternative, the complaint requests that the court order the United States to indemnify Lake Borgne for its losses, in the same amounts. Lake Borgne also seeks an order requiring defendant to pay all of its attorney's fees and costs in the state court <u>Borgnemouth</u> case, along with its attorney's fees and costs in the present litigation in case number 15-103C, and the $100,000.00 payment Lake Borgne made to Borgnemouth to forestall judgement.

On June 2, 2015, St. Bernard filed a motion for leave to file a complaint for intervention in case number 15-103C, and the motion was granted by the court on June 10, 2015. St. Bernard's complaint for intervention is virtually, and in all relevant respects, identical to the complaint filed by Lake Borgne, but requests that the various remedies requested by Lake Borgne be awarded to St. Bernard, as well as to Lake Borgne.

St. Bernard and Lake Borgne filed an additional complaint in case number 15-518C on May 20, 2015 and filed an amended complaint in case number 15-518C on June 19, 2015. The amended complaint is almost identical to the ones filed by St. Bernard and Lake Borgne in case number 15-103C, but concerns the property allegedly taken from the Olivier Plantation landowners and the state court judgment subsequently awarded against St. Bernard and Lake Borgne in the <u>Olivier Plantation</u> case.[7] As in case number

---

[6] In their complaints in both of the above-captioned cases, plaintiffs also allege the breach of an implied-in-fact contract between themselves and the Army Corps, stating the court has jurisdiction to hear their claims "founded upon an express contract, an implied-in-fact contract, or, in the alternative, an indemnity agreement" between themselves and the United States, and that defendant breached "the express and/or implied terms of the Amended Cooperation Agreement" by failing to provide compensation to the <u>Borgnemouth</u> and <u>Olivier Plantation</u> plaintiffs. Such an implied-in-fact contract, however, was not mentioned in any of plaintiff's opposition to defendant's motion to dismiss, and, at oral argument, counsel for plaintiffs conceded that no separate implied-in-fact contract exists in either of the above-captioned cases. Nor could plaintiffs have argued otherwise. This court lacks jurisdiction to hear a claim based on an implied-in-fact contract when an express contract exists. <u>See</u> <u>Rick's Mushroom Serv., Inc. v. United States</u>, 521 F.3d 1338, 1344 (Fed. Cir. 2008) (dismissing plaintiff's implied-in-fact contract claim for lack of jurisdiction on the grounds that the United States Court of Federal Claims "may only find an implied-in-fact contract when there is no express contract" (citing <u>Trauma Serv. Grp. v. United States</u>, 104 F.3d 1321, 1326 (Fed. Cir. 1997))). In the above-captioned cases there exists an express contract as a result of the Amended Cooperation Agreement that addresses the same subject matter as plaintiffs' alleged implied-in-fact contract, namely the Army Corps' obligations to compensate private landowners whose property was acquired in order to repair and rehabilitate the HSPP.

[7] The amended complaint in case number 15-518C also included several paragraphs related to plaintiffs' meeting with John Paul Woodley regarding possible deviations from the Army Corps' local sponsor requirements and Mr. Woodley's subsequent approval of

15-103C, plaintiffs allege breach of contract or, in the alternative, the existence of an indemnity agreement between themselves and the Army Corps. Plaintiffs seek to require defendant to pay the Olivier Plantation landowners the full amount of the state court judgment, including attorney's fees and interest, or in the alternative that defendant indemnify plaintiffs for the same amount. Plaintiffs also seek their attorney's fees and costs in the state court and present litigation, as well as the $50,500.00 payment each plaintiff made to the Olivier Plantation landowners to forestall judgement. On June 10, 2015, the court, with the agreement of the parties, consolidated the two above-captioned cases.

Defendant filed motions to dismiss in both case number 15-103C and case number 15-518C. In its motion filed in case number 15-518C, defendant states that the

> two cases are virtually identical, presenting the exact same legal arguments, based on the exact same contract, which is why they have been consolidated. The only difference between these two cases is the identity of the underlying landowners to whom the plaintiffs owe compensation for takings under the Louisiana constitution.

Defendant's motion to dismiss case number 15-518C, therefore, "contains only a brief overview of the action and only addresses factual matters unique to the *Olivier Plantation* matter, but otherwise incorporates our [defendant's] briefs filed in case no. 15-103C." Plaintiff filed a response to defendant's motion to dismiss in case number 15-103C, and re-filed the same document as its response to defendant's motion to dismiss in case number 15-518C, along with a note stating that defendant's motions to dismiss in both cases "present[] the same questions and arguments." Defendant filed a reply in support of its motion to dismiss in case number 15-103C.[8] In both cases, the parties filed a Joint Stipulation of Facts and a Notice of Document Upload including all of the relevant Louisiana state court decisions.

## DISCUSSION

Defendant seeks dismissal of the two consolidated cases under Rules 12(b)(1) (2015) and 12(b)(6) of the Rules of the Court of Federal Claims (RCFC), for lack of jurisdiction and for failure to state a claim for which relief may be granted, respectively. Defendant first argues that the court lacks jurisdiction to hear plaintiffs' claims because they are barred by the applicable statute of limitations. Defendant then argues that the court lacks jurisdiction to award plaintiffs' requests for the attorney's fees awarded against them in the state court <u>Borgnemouth</u> and <u>Olivier Plantation</u> cases because such awards are barred by law. Assuming the court has jurisdiction to hear plaintiffs' claims, defendant further argues that plaintiffs have failed to state a claim for breach of the Amended Cooperation Agreement because they cannot establish that defendant had a duty to pay

---

this waiver that were not included in the complaint for case number 15-103C. These details were, however, eventually stipulated to in the Joint Stipulation of Facts submitted to this court in both cases.

[8] Defendant did not file a separate reply in case number 15-518C.

compensation for the properties at issue. With regard to plaintiffs' alternative claim alleging the existence of an indemnification agreement between the parties, defendant argues such an indemnification agreement is barred by law.

It is well established that "'subject-matter jurisdiction, because it involves a court's power to hear a case, can never be forfeited or waived.'" Arbaugh v. Y & H Corp., 546 U.S. 500, 514 (2006) (quoting United States v. Cotton, 535 U.S. 625, 630 (2002)). "[F]ederal courts have an independent obligation to ensure that they do not exceed the scope of their jurisdiction, and therefore they must raise and decide jurisdictional questions that the parties either overlook or elect not to press." Henderson ex rel. Henderson v. Shinseki, 562 U.S. 428, 434 (2011); see also Gonzalez v. Thaler, 132 S. Ct. 641, 648 (2012) ("When a requirement goes to subject-matter jurisdiction, courts are obligated to consider sua sponte issues that the parties have disclaimed or have not presented."); Hertz Corp. v. Friend, 559 U.S. 77, 94 (2010) ("Courts have an independent obligation to determine whether subject-matter jurisdiction exists, even when no party challenges it." (citing Arbaugh v. Y & H Corp., 546 U.S. at 514)); Special Devices, Inc. v. OEA, Inc., 269 F.3d 1340, 1342 (Fed. Cir. 2001) ("[A] court has a duty to inquire into its jurisdiction to hear and decide a case." (citing Johannsen v. Pay Less Drug Stores N.W., Inc., 918 F.2d 160, 161 (Fed. Cir. 1990))); View Eng'g, Inc. v. Robotic Vision Sys., Inc., 115 F.3d 962, 963 (Fed. Cir. 1997) ("[C]ourts must always look to their jurisdiction, whether the parties raise the issue or not."). "Objections to a tribunal's jurisdiction can be raised at any time, even by a party that once conceded the tribunal's subject-matter jurisdiction over the controversy." Sebelius v. Auburn Reg'l Med. Ctr., 133 S. Ct. 817, 824 (2013); see also Arbaugh v. Y & H Corp., 546 U.S. at 506 ("The objection that a federal court lacks subject-matter jurisdiction . . . may be raised by a party, or by a court on its own initiative, at any stage in the litigation, even after trial and the entry of judgment."); Cent. Pines Land Co., L.L.C. v. United States, 697 F.3d 1360, 1364 n.1 (Fed. Cir. 2012) ("An objection to a court's subject matter jurisdiction can be raised by any party or the court at any stage of litigation, including after trial and the entry of judgment." (citing Arbaugh v. Y & H Corp., 546 U.S. at 506–07)); Rick's Mushroom Serv., Inc. v. United States, 521 F.3d at 1346 ("[A]ny party may challenge, or the court may raise sua sponte, subject matter jurisdiction at any time." (citing Arbaugh v. Y & H Corp., 546 U.S. at 506; Folden v. United States, 379 F.3d 1344, 1354 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2004), cert. denied, 545 U.S. 1127 (2005); and Fanning, Phillips & Molnar v. West, 160 F.3d 717, 720 (Fed. Cir. 1998)))); Mata v. United States, 118 Fed. Cl. 92, 95-96 (2014), recons. denied, 2015 WL 1000820 (Fed. Cl. Mar. 4, 2015); Pikulin v. United States, 97 Fed. Cl. 71, 76, appeal dismissed, 425 F. App'x 902 (Fed. Cir. 2011). In fact, "[s]ubject matter jurisdiction is an inquiry that this court must raise sua sponte, even where . . . neither party has raised this issue." Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings, 370 F.3d 1354, 1369 (Fed. Cir.) (citing Textile Prods., Inc. v. Mead Corp., 134 F.3d 1481, 1485 (Fed. Cir.), reh'g denied and en banc suggestion declined (Fed. Cir.), cert. denied, 525 U.S. 826 (1998)), reh'g and reh'g en banc denied (Fed. Cir. 2004), cert. granted in part sub. nom Lab. Corp. of Am. Holdings v. Metabolite Labs., Inc., 546 U.S. 975 (2005), cert. dismissed as improvidently granted, 548 U.S. 124 (2006); see also Avid Identification Sys., Inc. v. Crystal Import Corp., 603 F.3d 967, 971 (Fed. Cir.) ("This court must always determine for itself whether it has jurisdiction to hear the case before it, even

when the parties do not raise or contest the issue."), <u>reh'g and reh'g en banc denied</u>, 614 F.3d 1330 (Fed. Cir. 2010), <u>cert. denied</u>, 131 S. Ct. 909 (2011).

Pursuant to the RCFC and the Federal Rules of Civil Procedure, a plaintiff need only state in the complaint "a short and plain statement of the grounds for the court's jurisdiction," and "a short and plain statement of the claim showing that the pleader is entitled to relief." RCFC 8(a)(1), (2) (2015); Fed. R. Civ. P. 8(a)(1), (2) (2016); <u>see also</u> <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 677–78 (2009) (citing <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555–57, 570 (2007)). "Determination of jurisdiction starts with the complaint, which must be well-pleaded in that it must state the necessary elements of the plaintiff's claim, independent of any defense that may be interposed." <u>Holley v. United States</u>, 124 F.3d 1462, 1465 (Fed. Cir.) (citing <u>Franchise Tax Bd. v. Constr. Laborers Vacation Trust</u>, 463 U.S. 1 (1983)), <u>reh'g denied</u> (Fed. Cir. 1997); <u>see also</u> <u>Klamath Tribe Claims Comm. v. United States</u>, 97 Fed. Cl. 203, 208 (2011); <u>Gonzalez-McCaulley Inv. Grp., Inc. v. United States</u>, 93 Fed. Cl. 710, 713 (2010). "Conclusory allegations of law and unwarranted inferences of fact do not suffice to support a claim." <u>Bradley v. Chiron Corp.</u>, 136 F.3d 1317, 1322 (Fed. Cir. 1998); <u>see also</u> <u>McZeal v. Sprint Nextel Corp.</u>, 501 F.3d 1354, 1363 n.9 (Fed. Cir. 2007) (Dyk, J., concurring in part, dissenting in part) (quoting C. Wright and A. Miller, <u>Federal Practice and Procedure</u> § 1286 (3d ed. 2004)). "A plaintiff's factual allegations must 'raise a right to relief above the speculative level' and cross 'the line from conceivable to plausible.'" <u>Three S Consulting v. United States</u>, 104 Fed. Cl. 510, 523 (2012) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. at 555), <u>aff'd</u>, 562 F. App'x 964 (Fed. Cir.), <u>reh'g denied</u> (Fed. Cir. 2014). As stated in <u>Ashcroft v. Iqbal</u>, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' 550 U.S. at 555. Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" <u>Ashcroft v. Iqbal</u>, 556 U.S. at 678 (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. at 555).

When deciding a case based on a lack of subject matter jurisdiction or for failure to state a claim, this court must assume that all undisputed facts alleged in the complaint are true and must draw all reasonable inferences in the non-movant's favor. <u>See</u> <u>Erickson v. Pardus</u>, 551 U.S. 89, 94 (2007) ("In addition, when ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." (citing <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. at 555–56 (citing <u>Swierkiewicz v. Sorema N. A.</u>, 534 U.S. 506, 508 n.1 (2002)))); <u>Scheuer v. Rhodes</u>, 416 U.S. 232, 236 (1974) ("Moreover, it is well established that, in passing on a motion to dismiss, whether on the ground of lack of jurisdiction over the subject matter or for failure to state a cause of action, the allegations of the complaint should be construed favorably to the pleader."), <u>abrogated on other grounds by Harlow v. Fitzgerald</u>, 457 U.S. 800 (1982), <u>recognized by Davis v. Scherer</u>, 468 U.S. 183, 190 (1984); <u>United Pac. Ins. Co. v. United States</u>, 464 F.3d 1325, 1327–28 (Fed. Cir. 2006); <u>Samish Indian Nation v. United States</u>, 419 F.3d 1355, 1364 (Fed. Cir. 2005); <u>Boise Cascade Corp. v. United States</u>, 296 F.3d 1339, 1343 (Fed. Cir.), <u>reh'g and reh'g en banc denied</u> (Fed. Cir. 2002), <u>cert. denied</u>, 538 U.S. 906 (2003).

If a defendant or the court challenges jurisdiction or a plaintiff's claim for relief, however, the plaintiff cannot rely merely on allegations in the complaint, but must instead

bring forth relevant, competent proof to establish jurisdiction. See McNutt v. Gen. Motors Acceptance Corp. of Ind., 298 U.S. 178, 189 (1936); see also Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 747 (Fed. Cir. 1988). Therefore, although the court must assume that the undisputed facts alleged in the complaint are true for the purposes of the motion to dismiss and draws all reasonable inferences in the plaintiffs' favor, the facts alleged in the complaint must be plausible and not merely naked assertions devoid of a factual basis. See Ashcroft v. Iqbal, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."); see also McZeal v. Sprint Nextel Corp., 501 F.3d 1354, 1363 n.9 (Fed. Cir. 2007) (mere allegations of law and conclusions of fact are insufficient to support a claim); SUFI Network Servs., Inc. v. United States, 102 Fed. Cl. 656, 660 (2012) (plaintiff "must provide more than mere 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action.'" (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 555 (citing Papasan v. Allain, 478 U.S. 265, 286 (1986)))); Rack Room Shoes v. United States 718 F.3d 1370, 1376 (Fed. Cir.) reh'g and reh'g en banc denied, (Fed. Cir. 2013) cert. denied, 134 S. Ct. 2287 (2014); Kam-Almaz v. United States, 682 F.3d 1364, 1367-68 (Fed. Cir. 2012) ("[A] court is '"not bound to accept as true a legal conclusion couched as a factual allegation."'" (quoting Twombly, 550 U.S. at 555 (quoting Papasan v. Allain, 478 U.S. 265, 286 (1986)))).

Statute of Limitations

Initially, defendant argues that plaintiffs' claims must be dismissed for lack of jurisdiction under RCFC 12(b)(1) because, according to the government, plaintiffs failed to assert their claims within the applicable six-year statute of limitations established in 28 U.S.C § 2501 (2012). According to 28 U.S.C. § 2501:

> Every claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues. . . . A petition on the claim of a person under legal disability or beyond the seas at the time the claim accrues may be filed within three years after the disability ceases.

Id. "The six-year statute of limitations set forth in section 2501 is a jurisdictional requirement for a suit in the Court of Federal Claims." John R. Sand & Gravel Co. v. United States, 457 F.3d 1345, 1354 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2006), aff'd, 552 U.S. 130 (2008). The United States Court of Appeals for the Federal Circuit has indicated that a claim accrues "'"when all events have occurred to fix the Government's alleged liability, entitling the claimant to demand payment and sue here for his money."'" San Carlos Apache Tribe v. United States, 639 F.3d 1346, 1358-59 (Fed. Cir.) (quoting Samish Indian Nation v. United States, 419 F.3d 1355, 1369 (Fed. Cir. 2005) (quoting Martinez v. United States, 333 F.3d 1295, 1303 (Fed. Cir. 2003), cert. denied, 540 U.S. 1177 (2004))), reh'g en banc denied (Fed. Cir. 2011); see also FloorPro, Inc. v. United States, 680 F.3d 1377, 1381 (Fed. Cir. 2012); Martinez v. United States, 333 F.3d at 1303 ("A cause of action cognizable in a Tucker Act suit accrues as soon as all events have occurred that are necessary to enable the plaintiff to bring suit, i.e., when 'all events have occurred to fix the Government's alleged liability, entitling the claimant to demand payment and sue here for his money.'" (quoting Nager Elec. Co. v. United States, 177 Ct.

Cl. 234, 240, 368 F.2d 847, 851 (1966), motion denied, 184 Ct. Cl. 390, 396 F.2d 977 (1968)); Hopland Band of Pomo Indians v. United States, 855 F.2d 1573, 1577 (Fed. Cir. 1988); see also Brizuela v. United States, 103 Fed. Cl. 635, 639, aff'd, 492 F. App'x 97 (Fed. Cir. 2012), cert. denied 133 S. Ct. 1645 (2013); Parkwood Assocs. Ltd. P'ship v. United States, 97 Fed. Cl. 809, 813-14 (2011), aff'd, 465 F. App'x 952 (Fed. Cir. 2012); Klamath Tribe Claims Comm. v. United States, 97 Fed. Cl. at 209 (citing Alder Terrace, Inc. v. United States, 161 F.3d 1372, 1377 (Fed. Cir. 1998)). Accrual of a claim is "'determined under an objective standard'" and plaintiff does not have to possess actual knowledge of all the relevant facts in order for a cause of action to accrue. See FloorPro, Inc. v. United States, 680 F.3d at 1381 (quoting Fallini v. United States, 56 F.3d 1378, 1380 (Fed. Cir. 1995), cert. denied, 517 U.S. 1243 (1996)).

However, "[i]t is too well established to require citation of authority that a claim does not accrue until the claimant has suffered damages." Terteling v. United States, 167 Ct. Cl. 331, 338, 334 F.2d 250, 254 (1964). "A 'breach of contract claim accrue[s] when [the plaintiff] should have known that it had been damaged by the government's breach.'" SAB Const., Inc. v. United States, 66 Fed. Cl. 77, 87 (2005) (quoting Ariadne Fin. Servs. Pty. Ltd. v. United States, 133 F.3d 874, 878 (Fed. Cir. 1998)), aff'd, 206 F. App'x 992 (Fed. Cir. 2006) (brackets in original).  As noted by the court in SAB Construction:

> It is perhaps more common that the plaintiff is damaged at the time of breach, but in some circumstances . . . the plaintiff may not be damaged until much later. In such a case, the claim for breach of contract will not accrue for statute of limitations purposes until the damages are incurred.

Id. at 88.

In the cases currently before the court, Lake Borgne filed its complaint in case number 15-103C on February 3, 2015, St. Bernard filed its separate complaint in case number 15-103C on June 2, 2015, and St. Bernard and Lake Borgne filed their complaint in case number 15-518C on May 20, 2015. According to defendant, because the Amended Cooperation Agreement explicitly excluded payment for Public Sponsor LERD, as soon as plaintiffs "became aware that a property owner within the Public Sponsor LERD made a claim, they would have instantly known the United States Government would not pay." Thus, defendant argues, the "only question" determining when plaintiffs' claims accrued is when they knew that Borgnemouth and the Olivier Plantation landowners were demanding compensation for the activities at issue in state court. According to defendant, with respect to case number 15-103C, plaintiffs must have known Borgnemouth was demanding compensation, and, thus, their cause of action, thus, accrued no later than, January 8, 2009, when Lake Borgne stated in its answer in the Borgnemouth case in the state trial court that the Army Corps was a necessary party to that litigation. With respect to case number 15-518C, defendant argues that plaintiffs must have known the Olivier Plantation landowners were demanding compensation, and, thus, their cause of action must have accrued no later than, May 8, 2009, when St. Bernard moved for leave to file an amended answer and third-party complaint in the Olivier Plantation case in the state trial court, alleging that the Army Corps was required under the Amended Cooperation Agreement to compensate the Olivier Plantation landowners.

According to defendant, Lake Borgne's February 3, 2009 answer and St. Bernard's May 8, 2009 third-party complaint in the state court proceedings establish that, at the moment these documents were filed, Lake Borgne and St. Bernard had knowledge of the takings at issue in the state court and the availability to them "of the very cause of action" for breach of contract that they present here. Because plaintiffs waited more than six years after these dates, February 3, 2009 and May 8, 2009, respectively, to file their present actions in this court, defendant argues that plaintiffs' claims are untimely and should be dismissed.

Both plaintiffs respond that their claims for breach of contract and indemnification "did not arise until the obligation[s] to the landowner[s] w[ere] established by the Louisiana state courts." Plaintiffs also argue that defendant is barred by the doctrine of judicial estoppel from taking its current position that plaintiffs' claims arose in 2009 because defendant allegedly took a contrary position when it argued that Lake Borgne's indemnification claim was unripe in the removal proceedings in the United States District Court for the Eastern District of Louisiana.

The court rejects defendant's argument that the plaintiffs' causes of action accrued the moment plaintiffs knew that Borgnemouth and the Olivier Plantation landowners were demanding compensation in Louisiana state court for the activities at issue. Although, at that time, plaintiffs were aware that Borgemouth and the Olivier Plantation landowners had asserted claims in state court to be compensated for the takings of what St. Bernard and Lake Borgne allege was Private LERD, defendant has not shown that plaintiffs had suffered any damages as a result of an alleged breach, pending the outcome of the state court cases. Nor do the state court filings establish that plaintiffs understood they had, at that time, suffered damages. Lake Borgne's answer in the <u>Borgnemouth</u> case simply stated that Borgnemouth had "failed to join a party needed for just adjudication." Similarly, St. Bernard's third-party complaint in the <u>Olivier Plantation</u> case alleged only that the Olivier Plantation landowners had been damaged by the Army Corps' actions and that, under the terms of the Amended Cooperation Agreement, St. Bernard would be entitled to contribution from defendant United States "for any and all sums that [the <u>Olivier Plantation</u>] Plaintiffs <u>may</u> be awarded in this action." (emphasis added).

Because damages are a necessary element of a claim for breach of contract, plaintiffs' causes of action against defendant would not have accrued until plaintiffs had suffered such damages. <u>See</u> <u>Terteling v. United States</u>, 167 Ct. Cl. at 338. In <u>Terteling v. United States</u>, the government contracted to have gravel extracted from a certain gravel pit, which the government agreed to "furnish without cost." <u>Id.</u> at 334. Unfortunately, the pit was actually owned by a private party who sued the contractors for unauthorized extraction. <u>See</u> <u>id.</u> at 335-37. Although the <u>Terteling</u> contractors were ultimately successful in defending the lawsuit, they incurred substantial litigation expenses, and sued the government for breach of contract, arguing that because of these expenses, the government had failed to provide the pit "without cost." <u>Id.</u> at 332-33. The government sought to have the claims dismissed as untimely, arguing that the applicable statute of limitations had begun to run when the contractors' work was completed and the contractual payment was made by the government. <u>See</u> <u>id.</u> at 337. The court rejected that position, reasoning that "at that point plaintiffs had not suffered any damages" and,

thus, "it was impossible for the contractors at that time to set up a claim." Id. at 338. Instead, the United States Court of Claims held that "[i]t was only when the litigation ended that the contractors could determine the total amount of the litigation expenses." Id. According to the court, "these contractors had the right to wait until their full obligations were ascertainable before bringing suit." Id. at 339 (citing United States v. Dickenson, 331 U.S. 745, 749 (1947)).

Although the details of the contracts at issue in Terteling and the instant cases differ, the central teaching of the Terteling case is applicable here, i.e., plaintiffs have "the right to wait until their full obligations were ascertainable before bringing suit." Id.; see also State of Ill. v. United States, 15 Cl. Ct. 399, 408 (1988) (holding that the statute of limitations did not begin to run until after a "final judicial determination" was made in a separate case in which such a determination "was a prerequisite to enable plaintiff to determine its rights and whether it had suffered damages because of defendant's nonfeasance"). In the cases before the court, St. Bernard and Lake Borgne were unable to ascertain if they had suffered any damages until after the conclusion of the two state court cases, including after the final possibility of appeal had been exhausted. See Terteling v. United States, 167 Ct. Cl. at 338 ("[T]he termination of the litigation was not until the Supreme Court denied certiorari . . . ."); see also State of Ill. v. United States, 15 Cl. Ct. at 408 (holding that the statute of limitations ran from the time the relevant issue allowing plaintiff to determine its damages was "no longer subject to judicial change"). Thus, it was not until plaintiffs' writs were denied by the Louisiana Supreme Court in the Borgnemouth and Olivier Plantation cases on September 26, 2014 and February 27, 2015, respectively, that the statute of limitations for plaintiffs' claims began to run. St. Bernard and Lake Borgne filed their complaints in the case in this court arising from the state court Borgnemouth case, case number 15-103C, on June 2, 2015 and February 3, 2015, respectively, and their combined complaint in the case in this court arising from the state court Olivier Plantation case, case number 15-518C, on May 20, 2015. As such, plaintiffs' claims fall well within the six year statute of limitations. This conclusion is supported by the decision of the District Court Judge's decision in Olivier Plantation, LLC v. St. Bernard Parish not to transfer the case to this court. See generally Olivier Plantation, LLC v. St. Bernard Parish, 744 F. Supp. 2d 575. As noted above, the District Court Judge declined to transfer St. Bernard's third-party claims against the Army Corps to the Court of Federal Claims even though she concluded that the Court of Federal Claims would be the proper venue because the claims were premature and ultimately depended on the resolution of the Olivier Plantation landowners' suits against St. Bernard and Lake Borgne. See id. at 588-89.

Given that this court has jurisdiction to entertain plaintiffs' claims, plaintiffs' defense that defendant's arguments contradict defendant's previously held position in the removal proceedings before the United States District Court for the Eastern District of Louisiana and, thus, defendant's arguments are barred by the doctrine of judicial estoppel, need not be addressed.

Plaintiffs' Request for Attorney's Fees

Defendant next argues that this court lacks jurisdiction to grant plaintiffs' request for the attorney's fees awarded against St. Bernard and Lake Borgne in the state court Borgnemouth and Olivier Plantation cases. According to defendant, citing United States v. Mitchell, 463 U.S. 206, 212 (1983), the court lacks jurisdiction because the United States may not be sued without its consent absent a waiver of sovereign immunity; and there is no provision in the Amended Cooperation Agreement providing for such a waiver. Moreover, defendant argues that the language in Article V of the Amended Cooperation Agreement explicitly excludes payments for any costs incurred by the plaintiffs, including attorney's fees awarded against the plaintiffs in state court actions. Finally, defendant argues that these attorney's fees are an element of plaintiffs' "Non-Existent" implied indemnification agreement and must be dismissed for the same reasons that plaintiffs' alleged indemnity agreement argument must be rejected.

In response, plaintiffs argue that the attorney's fees they seek were not incurred in the present action, but, instead, are "an inseparable component" of the just compensation awarded to Borgnemouth and the Olivier Plantation landowners by the Louisiana courts. Plaintiffs argue that, under Article II.B.1 of the Amended Cooperation Agreement, the Army Corps agreed to pay "just compensation to the owners of a compensable interest in" Private Sponsor LERD. Plaintiffs further argue, citing the Louisiana Court of Appeals decision in Borgnemouth Realty Co., Ltd. v. Parish of St. Bernard, 141 So. 3d at 902-03, that attorney's fees are a statutorily required component for just compensation due for a taking under Louisiana law. Thus, according to plaintiffs, defendant "is liable under its contractual indemnification obligations for the entire amount awarded" in the state court litigations, including attorney's fees.

As defendant notes, "[i]t is axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction." United States v. Mitchell, 463 U.S. at 212. With regard to breach of contract claims, "[t]he source of consent for such suits unmistakably lies in the Tucker Act." Id. at 216; see 28 U.S.C. § 1491(a)(1). "The Tucker Act's waiver of sovereign immunity, however, does not extend to expenses incurred in litigating against the United States, because under the so-called 'American Rule' a specific waiver by Congress is required in order to recover attorney's fees incurred in litigation with the Government." Chevron U.S.A., Inc. v. United States, 71 Fed. Cl. 236, 268 (2006) (citing Alyeska Pipeline Serv. Co. v. Wilderness Soc., 421 U.S. 240, 247 (1975); Texas Instruments v. United States, 991 F.2d 760, 763 (Fed. Cir. 1993) ("[I]t is [nevertheless] well-settled [that] in the absence of specific statutory authority, expenses incurred in litigation, whether legal, accounting, secretarial or other, are not award[ed against the United States]." (quoting Estate of Berg v. United States, 231 Ct. Cl. 466, 476 (1982)) (first alteration added)); Machinery Corp. of Am. v. Gullfiber AB, 774 F.2d 467, 471 (Fed. Cir. 1985); Piggly Wiggly Corp. v. United States, 112 Ct. Cl. 391, 432 (1949) ("[A]ttorneys fees are not allowed in suits against the United States in the absence of an express statutory provision allowing them . . . .").

Contrary to defendant's apparent argument, however, there is no absolute bar against the award of any attorney's fees against the United States. See Chevron U.S.A.,

Inc. v. United States, 71 Fed. Cl. at 268 ("The American Rule, however, is not a blanket prohibition against the recovery of attorney's fees." (citing Mass. Bay Trans. Authority v. United States, 129 F.3d 1226, 1230 (Fed. Cir. 1997)); Southern Cal. Fed. Savings & Loan Assoc. v. United States, 57 Fed. Cl. 598, 624 (2003), rev'd on other grounds, 422 F.3d 1319 (Fed. Cir. 2005)). Instead, attorney's fees not incurred in litigation against the United States "are compensable if they are 'a direct and foreseeable consequence' of the Government's 'breach of its contractual undertakings.'" SUFI Network Servs., Inc. v. United States, 105 Fed. Cl. 184, 195 (2012) (quoting Mass. Bay Transp. Auth. v. United States, 129 F.3d at 1232–33), aff'd in part, vacated in part, 785 F.3d 585 (Fed. Cir. 2015). Such attorney's fees have been awarded against the government in a variety of cases. See SUFI Network Servs., Inc. v. United States, 785 F.3d 585, 592 (Fed. Cir. 2015) (affirming trial court's award of attorney's fees incurred by plaintiff in preparing and submitting its claims to a contracting officer as result of government's breach on the grounds that "[u]nder common law, damages for breach of contract are awarded to place the wronged party in the position it would have been in had the contract been fully performed" (citing Mass. Bay Trans. Auth. v. United States, 129 F.3d at 1232)); Mass. Bay Trans. Auth. v. United States, 129 F.3d at 1232-33 (holding that the United States was liable for plaintiff's state court attorney's fees resulting from its breach of contract); Terteling v. United States, 167 Ct. Cl. at 340-41 (holding that, because the government breached an implied contract with plaintiff contractors to "do nothing which would result in any cost to the contractors," the government was "liable for the resulting litigation expenses" incurred by the contractors in state court); Pratt v. United States, 50 Fed. Cl. 469, 482-83 (2001) ("[W]here legal fees incurred in an action by a third party are determined to be a direct and foreseeable consequence of defendant's breach, they have been awarded." (citing Terteling v. United States, 167 Ct. Cl. at 340)); Chevron U.S.A., Inc. v. United States, 71 Fed. Cl. at 270-71 (denying motion to dismiss plaintiff's request for attorney's fees incurred participating in an "equity finalization process" because "they were not incurred in litigation against the United States").

Massachusetts Bay Transportation Authority v. United States, a binding precedent not cited by defendant in its submissions to this court, appears to directly reject defendant's argument. In Massachusetts Bay, the Massachusetts Bay Transportation Authority (MBTA) entered into a Construction Agreement with the Federal Railroad Administration (FRA) to renovate Boston's South Station, which was owned by the MBTA. See Mass. Bay Trans. Auth. v. United States, 129 F.3d at 1228-29. Among the obligations the Construction Agreement imposed on the FRA was to secure insurance endorsements safeguarding the MBTA "against liability in the event of claims due to design errors, omissions, or acts of negligence" by the project's architect/engineers, which the FRA failed to do. Id. at 1231-32. Due to design errors, the renovation was ultimately completed 956 days late and substantially over budget. See id. at 1230. The MBTA, therefore, brought a declaratory action against the project's construction contractor in Massachusetts state court to resolve "various issues of liability and responsibility." Id. The MBTA also filed suit against the FRA in the Court of Federal Claims for breach of contract, offering, among other allegations, that FRA had failed to secure the required insurance endorsements. See id. Among the damages sought by the MBTA were "the expenses of the Massachusetts litigation including attorney fees." Id. at 1232. The FRA, using

19

language almost identical to the defendant in the present case, argued that such a claim was barred. See id. at 1233. The Federal Circuit directly rejected this argument, stating:

> FRA argues that MBTA's claim to include attorney fees and consultant expenses as damages for breach of § 222(c) [which required the FRA to obtain the insurance endorsements] is barred because no statute has waived sovereign immunity for such recovery, citing *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y,* 421 U.S. 240, 95 S. Ct. 1612, 44 L. Ed. 2d 141 (1975) for the proposition that attorney fees are not recoverable in an action against the United States unless expressly provided for by Congress. However, the recovery sought by MBTA is not for attorney fees in an action against the United States, but for damages for breach of a contract to obtain insurance. The damages are measured by the benefit MBTA would have received had FRA not breached its obligation under § 222(c), not the cost of MBTA's action against the United States. Thus damages would include the Massachusetts litigation and settlement expenditures to the extent that they would have been covered by the insurance endorsements and thus would not have been incurred by MBTA.

Mass. Bay Trans. Auth. v. United States, 129 F.3d at 1333.

In their complaints in the present actions, plaintiffs request that the court order defendant to pay "all amounts owed . . . in satisfaction of the Louisiana State Court Judgment[s]" in the Borgnemouth and Olivier Plantation cases, including the attorney's fees the state court awarded to Borgnemouth and the Olivier Plantation landowners. As the government itself points out in its motion to dismiss case number 15-103C, the United States was not a party to either of the state court Borgnemouth and Olivier Plantation cases. Thus, as in the Massachusetts Bay case, plaintiffs in the above-captioned cases do not seek to recover "attorney fees in an action against the United States," but as damages for defendant's alleged breach of contract or based on the alleged indemnity agreement. See id. The measure of such damages are the fees incurred because of the defendant's alleged breach of contract, or the benefit to the plaintiffs from the parties' alleged indemnity agreement, and not "the cost of [plaintiffs'] action against the United States." Id. The court, thus, has jurisdiction to consider the attorney's fees sought by plaintiffs.

Nor are the attorney's fees sought by plaintiffs barred by Article V of the Amended Cooperation Agreement. Article V states, in full: "The Public Sponsors shall not be entitled to receive a credit or reimbursement for any costs incurred by the Public Sponsors hereunder." The term "hereunder" indicates that the Article V is referring to costs incurred by the Public Sponsors in fulfillment of their obligations outlined in the Amended Cooperation Agreement. See "Hereunder," Black's Law Dictionary 844 (10th ed. 2014) ("2. In accordance with this document <notice hereunder must be provided within 30 days after the loss>."). The attorney's fees sought by plaintiffs were not incurred by the plaintiffs carrying out their obligations under the Amended Cooperation Agreement, but as part of court judgments that allegedly resulted from defendant's breach of that the Amended Cooperation Agreement. The attorney's fees, therefore, are not barred by Article V.

Finally, the court defers addressing defendant's argument that the attorney's fees sought by plaintiffs must be dismissed as an element of plaintiffs' alleged indemnification agreement. As discussed below, the court is deferring ruling on whether plaintiff has adequately pled the existence of such an indemnification agreement.

Plaintiffs' Claims for Breach of Contract

Defendant also argues that, if the court finds that jurisdiction exists, plaintiffs' breach of contract claims should be dismissed for failure to state a claim under RCFC 12(b)(6). Defendant does not challenge the existence of a valid contract between the Army Corps and both plaintiffs in the form of the Amended Cooperation Agreement. Instead, defendant argues that plaintiffs have failed to establish that the Army Corps had a valid duty under the contract to pay compensation for the properties involved in the Borgnemouth and Olivier Plantation cases because the property interests involved allegedly constituted Public Sponsor LERD under Article III.A.1 of the Amended Cooperation Agreement.

Under the terms of the Amended Cooperation Agreement, the defendant's obligations depended on whether the property interests at issue constituted Public Sponsor or Private LERD. Article III.A of the Amended Cooperation Agreement defines LERD as "lands, easements, and rights-of-way, including suitable borrow and dredged or excavated material disposal areas." Article III.A.1 of the Amended Cooperation Agreement defines Public Sponsor LERD as "LERD that they [the Public Sponsors, i.e., St. Bernard and Lake Borgne] own, claim or control," and Article III.A.3 defines Private LERD as "all other LERD not owned, claimed, or controlled by the Public Sponsors or Other Non-Federal Governmental Entities."[9] Both of these sections require the Public Sponsors to provide the Army Corps with a right of entry to LERD "determined by the Government to be necessary for the construction, operation and maintenance of the Rehabilitation Effort." With regard to Private LERD, Article III.B of the Amended Cooperation Agreement requires that "the Government, in the name of the Public Sponsors, identify and provide just compensation to the owners of a compensable interest in the Private LERD." No similar obligation to compensate the owners of the LERD is, however, included with regard to Public Sponsor LERD. That none was intended is made explicit in Article I.B of the Amended Cooperation Agreement's definition of the term "Rehabilitation Effort costs," which states that "[t]he term shall not include . . . the costs of lands, easements, rights-of-way, borrow, or relocations that are owned, claimed, or controlled by the Public Sponsors."

Although both defendant and plaintiffs present arguments, discussed below, as to whether the LERD at issue in the above-captioned cases was Public Sponsor or Private LERD, neither party attempts to define the exact property interests that constituted the LERD at issue in the cases before the court. Before discussing the parties' arguments,

---

[9] The term "Other Non-Federal Governmental Entities" is not defined in the Amended Cooperation Agreement. None of the parties, however, alleges that the LERD at issue in the present cases was owned by such entities.

the court, therefore, looks to the record to define the LERD at issue. Article III.A of the Amended Cooperation Agreement states:

> The Government shall provide the Public Sponsors with a description of the anticipated real estate requirements and relocations for the Rehabilitation Effort. Thereafter, the Public Sponsors shall, at no cost to the Government provide right of entry, to all lands, easements, and rights-of-way, including suitable borrow and dredged or excavated material disposal areas (hereinafter LERD) as may be determined by the Government in that description, or in any subsequent description, to be necessary for the construction, operation, and maintenance of the Project and the Rehabilitation Effort, in the manner hereinafter discussed.

(emphasis added). Similarly, Article III.A.1 of the Amended Cooperation Agreement states: "The Public Sponsors shall provide right of entry to all LERD that they own, claim or control (hereinafter Public Sponsor LERD) . . . as determined by the Government to be necessary for the construction, operation and maintenance of the Rehabilitation Effort." (emphasis added). The Amended Cooperation Agreement thus envisioned a two step process: 1) the Army Corps would provide plaintiffs with a description of the LERD it needed; and 2) the plaintiffs would provide the Army Corps with right of entry to this LERD. The parties' obligations under the Amended Cooperation Agreement, therefore, attached to the LERD included in the Army Corps' description.

On September 19, 2005, the Army Corps sent a letter to Lake Borgne describing the LERD it would need, as follows:

> This [LPV Levee] repair work will require considerable earthen borrow material. A potential source for this material has been identified as a 200 foot-wide strip of land along the levee between the Bayou Bienvenue Control Structure and the southeast corner of the hurricane protection levee (station 1007+91). This area which is described as a 300-ft long strip of land measured from the edge of the existing levee right-or-way is shown on the enclosed map entitled "St. Bernard Borrow Area." The top five (5) feet of this material will be removed and wasted as it is unsuitable for levee construction. The material will be obtained by excavating the material to a depth of no more than an additional 15 feet.

The September 19, 2005 letter goes on to request that Lake Borgne provide the Army Corps with a right of entry to the identified "borrow area." Lake Borgne ultimately provided the Army Corps with a right of entry to the LERD the Army Corps had requested in its September 30, 2005 Authorization for Entry, in which it authorized the Army Corps "to enter upon these lands to obtain borrow, access, and construct (repair and rehabilitate) said [LPV] levee." Plaintiffs allege that Borgnemouth's and the Olivier Planation landowners' properties were among those identified in the Army Corps' September 19, 2005 letter and Lake Borgne's September 30, 2005 Authorization for Entry. While neither of the documents defines the term "borrow area," both the Army Corps' statement that it would excavate between five and twenty feet of soil from the borrow area and Lake

Borgne's statement that it authorized the Army Corps to "obtain borrow" from the requested properties, show that, at a minimum, the Army Corps was requesting the right to remove between five to twenty feet of soil for the purposes of the present motion, the LERD at issue in the above-captioned cases, thus, encompassed, at a minimum, the right to remove between five to twenty feet of subsurface material from portions of the properties owned by Borgnemouth and the Olivier Plantation landowners for the purpose of repairing the LPV Levees.[10]

Defendant argues that the Army Corps had no duty to compensate the owners of the LERD at issue in either of the above-captioned cases because it was Public Sponsor LERD.  According to defendant, the property at issue in both of the above-captioned cases constituted Public Sponsor LERD because Lake Borgne and St. Bernard "had asserted for decades that [they] 'owned, claimed, or controlled' rights to 'lands, easements, and rights-of-way, including borrow and spoil-disposal areas necessary for construction, operation, and maintenance of the' LPV project." (footnote omitted).  Defendant points to six documents it claims show that plaintiffs made such assertions: 1) the August 16, 1966 Act of Assurance concluded between St. Bernard, Lake Borgne and the Army Corps; 2) the August 15, 1966 Resolution adopted by Lake Borgne and incorporated into the 1966 Act of Assurance; 3) the August 15, 1966 Resolution adopted by St. Bernard and incorporated into the 1966 Act of Assurance; 4) the December 1, 1977 Agreement concluded between St. Bernard, Lake Borgne, and the Army Corps; 5) the January 13, 1976 Resolution adopted by St. Bernard and incorporated into the 1977 Agreement; and 6) the April 20, 1976 Resolution adopted by Lake Borgne and incorporated into the 1977 Agreement, all executed long before the 2005 Amended Cooperation Agreement signed by plaintiffs and defendant. Defendant also argues that the LERD at issue in both case numbers 15-103C and 15-518C constituted Public Sponsor LERD because both St. Bernard and Lake Borgne represented to the state courts in the <u>Borgnemouth</u> and <u>Olivier Plantation</u> cases that Lake Borgne possessed rights to remove borrow material from the Borgnemouth and the Olivier Plantation landowners land under the three appropriating resolutions passed by Lake Borgne on April 11, 1967, June 6, 1967, and May 13, 1969. In support of this claim, defendant points to the Louisiana Court of Appeals' finding in the <u>Borgnemouth</u> case that St. Bernard and Lake Borgne had "primarily claim[ed] that the [Lake Borgne] Levee District had already acquired <u>the right to remove the borrow material</u> by virtue of a pre-existing extra-codal servitude, or a *faux*-servitude, which . . . had been appropriated by the Levee District between 1967 and 1969." <u>Borgnemouth Realty Co., Ltd. v. Parish of St. Bernard</u>, 141 So.

---

[10] This conclusion is bolstered by the text of St. Bernard's September 29, 2005 Commandeering Order, in which St. Bernard allegedly "commandeered," and granted Lake Borgne right of entry to, Borgnemouth's and the Olivier Plantation landowners' properties. In the Commandeering Order, St. Bernard stated that it was obtaining "an assignable right and easement to clear, borrow, excavate and remove soil, dirt, and other materials from said private immovable property." Thus, like Lake Borgne in the Authorization for Entry, St. Bernard apparently believed that the LERD the Army Corps had requested included the right to remove subsurface materials from Borgnemouth's and the Olivier Planation landowners' properties.

3d at 895 (footnotes omitted and underline added).[11] Defendant claims that this indicates that the property interest at issue "constitutes Public Sponsor LERD since the Levee District has claimed that it possessed the rights to this property since at least 1967."[12]

Plaintiffs argue that the LERD at issue was Private LERD on two grounds. First, plaintiffs argue, citing the decision of the Louisiana Court of Appeals in Borgnemouth Realty Co., Ltd. v. Parish of St. Bernard, that plaintiffs never had the right to excavate borrow material from these properties, and, therefore, the LERD at issue could not be Public Sponsor LERD (citing Borgnemouth Realty Co., Ltd. v. Parish of St. Bernard, 141 So. 3d at 897 ("To this point, it is clear that Borgnemouth would be the owner of the soil and clay under its tract of land and that it would be entitled to just compensation for the borrowing of its minerals by these political subdivisions.")). Second, plaintiffs argue that the process by which a right of entry to the properties at issue was delivered to the Army Corps shows that it was Private LERD under the Amended Cooperation Agreement. In particular, plaintiffs argue that they followed the process outlined under Article III.A.3 of the Amended Cooperation Agreement for providing right of entry to Private LERD when St. Bernard "commandeered" the LERD requested by the Army Corps from its private

_____

[11] Review of the filings in the state court Olivier Plantation case, provided by the parties as part of a joint Notice of Document Upload filed with the court July 17, 2015, reveals that St. Bernard and Lake Borgne made a similar claim before the trial court in the Olivier Plantation case regarding the Olivier Plantation landowners' property.

[12] Defendant also argues that Lake Borgne conceded in its complaint in case number 15-103C that the LERD at issue constituted Public Sponsor LERD, comparing Lake Borgne's statement in its complaint that "St. Bernard and the Levee District have now exhausted all legal avenues to deliver the property at issue to the Corps, free and clear of costs" with the language in Article III.A.1 of the Amended Cooperation Agreement that "[t]he Public Sponsors shall provide right of entry to all LERD that they own, claim, or control . . . in a manner that is free and clear of any liens, defects of title, or encumbrances." The quoted statement from Lake Borgne's complaint comes immediately after four paragraphs in which Lake Borgne describes the bare outlines of the state court Borgnemouth case:  Borgnemouth filed suit in state court seeking just compensation from St. Bernard and Lake Borgne for the borrow material removed by the Army Corps; the state court found St. Bernard and Lake Borgne jointly liable; St. Bernard and Lake Borgne unsuccessfully appealed this decision to the Louisiana Court of Appeal; and the Louisiana Court of Appeal denied St. Bernard's and Lake Borgne's writ applications. The portion of the complaint quoted by defendant is simply stating the facts, i.e., plaintiffs tried and failed to prove ownership over the LERD at issue in state court. Moreover, as discussed below, that plaintiffs made such an argument in state court does not change any obligations the Army Corps had under the Amended Cooperation Agreement with respect to the LERD at issue in the above-captioned cases. That Lake Borgne used the same "free and clear" phrase as was used in the Amended Cooperation Agreement with regard to Public Sponsor LERD is not enough to transform their statement of fact regarding the Borgnemouth case into an admission that the LERD at issue in that and the present case is Public Sponsor LERD, an as yet undetermined issue.

owners, St. Bernard transferred the right of entry to the properties to Lake Borgne, and Lake Borgne then tendered the right of entry to the Army Corps. Therefore, according to plaintiffs, "[t]he land and borrow material at issue meets the definition of 'Private LERD' on all accounts."

Defendant overstates the meaning of the language it quotes from the 1966 Act of Assurance, the 1977 Agreement between the parties, and the four resolutions issued by plaintiffs in 1966 and 1976. The August 16, 1966 Act of Assurance states that St. Bernard and Lake Borgne "will jointly and severally, without cost to the United States . . . [p]rovide all lands, easements, and rights-of-way, including borrow and spoil-disposal areas necessary for construction, operation, and maintenance of the [HSP] project." The December 1, 1977 Agreement between the parties states that St. Bernard and Lake Borgne "agree that they will, without cost to the United States . . . [p]rovide all lands, easements, and rights-of-way, including borrow and spoil-disposal areas necessary for construction, operation, and maintenance of the [HSP] project." The August, 15, 1966 Resolution issued by Lake Borgne states that the President of the Board of Commissioners of Lake Borgne is "authorized, empowered and directed . . . to acquire and make available, without cost to the United States, all lands, easements, and rights-of-way for that portion of the [HSP] project located in the Parish of St. Bernard." The August 16, 1966 Resolution issued by St. Bernard states that the President of St. Bernard is "authorized, empowered and directed" to do the same. The January 13, 1976 Resolution adopted by St. Bernard states that St. Bernard "agrees that it will, without cost to the United States . . . [p]rovide all lands, easements, and rights-of-way, including borrow and spoil-disposal areas necessary for construction, operation, and maintenance of the [HSP] project." The April 20, 1976 Resolution adopted by Lake Borgne states that Lake Borgne agrees to do the same. In each of these documents, plaintiffs state either that they "will," or that their executive is "authorized, empowered and directed" to, provide the United States "all lands, easements, and rights-of-way necessary" for the HSPP. Each document, thus, promises, at some unspecified future date, to provide the government with certain, unspecified, lands, easements, or rights-of-way. Such promises do not imply that Lake Borgne or St. Bernard owned, claimed, or controlled any particular lands, easements, or rights-of-way, at the time they were made, or anytime thereafter, let alone the specific LERD involved in the present litigation. The documents, therefore, do not provide evidence as to whether the LERD at issue in the above-captioned cases was Private or Public Sponsor LERD.

Defendant next argues that the LERD at issue was Public Sponsor LERD because St. Bernard and Lake Borgne represented in state court that they owned, claimed, or controlled the LERD at issue, including rights to borrow material, based on servitudes Lake Borgne had obtained through three appropriating resolutions it passed on April 11, 1967, June 6, 1967, and May 13, 1969. The court notes that Article II.B.1 of the Amended Cooperation Agreement states:

> [A]fter receiving the Public Sponsors' right of entry to the lands, easements, and rights of way, including suitable borrow and dredged or excavated material disposal areas (LERD) that are described in Article III.A.2. and III.A.3 of this Amendment, the Government, subject to the availability of

> appropriations, shall identify and pay just compensation to the owners of a compensable interest in the LERD described in Article III.A.3. of this Amendment.

This language indicates that the Army Corps' obligations with respect to any Private LERD attached when the Army Corps received the right of entry to the LERD from either St. Bernard or Lake Borgne. Further, there is no indication in the Amended Cooperation Agreement that any actions taken by either of the plaintiffs after offering the right of entry to the Army Corps could affect or modify the Army Corps' obligations. Lake Borgne provided a right of entry to the Army Corps to the LERD at issue in both of the above-captioned cases with its September 30, 2005 Authorization for Entry. The state court Borgnemouth and Olivier Plantation cases began when the plaintiffs in those cases filed their complaints on November 13, 2008 and May 18, 2007, respectively. Any statements made by St. Bernard and Lake Borgne in the state court cases regarding the LERD at issue came years after the Army Corps had received a right of entry to that LERD. These statements could not have altered the obligations that the Army Corps may have had under the Amended Cooperation Agreement or transform Private LERD into Public Sponsor LERD. The plaintiffs' statements in state court, therefore, are not dispositive as to whether Lake Borgne or St. Bernard have stated a claim for breach of contract in this court.

Defendant also argues that the statements by the plaintiffs in the Borgnemouth and Olivier Plantation cases regarding the April 11, 1967, June 6, 1967, and May 13, 1969 resolutions issued by Lake Borgne indicate that Lake Borgne "claimed that it possessed the rights" to the LERD at issue "since at least 1967." As noted above, the LERD at issue included the right to remove up to twenty feet of subsurface material from portions of Borgnemouth and the Olivier Plantation landowners' properties for the purpose of repairing the LPV Levees. By contrast, in each of the April 11, 1967, June 6, 1967, and May 13, 1969 resolutions, Lake Borgne claims to have appropriated only "right[s] of way" and "temporary spoil easement[s]" in the properties requested by the Army Corps. As both parties note in their briefs, the Louisiana Court of Appeals ultimately found that, through this language, Lake Borgne had not obtained any rights under Louisiana State law to "excavate, exploit, mine, or otherwise remove the soil or clay" owned by Borgnemouth or the Olivier Plantation landowners. See Borgnemouth Realty Co., Ltd. v. Parish of St. Bernard, 141 So. 3d at 896; see also Olivier Plantation, L.L.C. v. Parish of St. Bernard, 151 So. 3d at 969 (holding that the holding in Borgnemouth Realty Co., Ltd. v. Parish of St. Bernard was "dispositive of all the issues in this case" with the exception of attorney's fees). The Louisiana Court of Appeals also found that, "[a]ll of the resolutions are silent about exploiting the land for soil or clay to construct the levee" and that nothing in the resolutions suggests an intent to appropriate such rights. Borgnemouth Realty Co., Ltd. v. Parish of St. Bernard, 141 So. 3d at 899. Such "silence" in the three resolutions about "exploiting" any properties for their soil or clay precludes a finding on defendant's motion to dismiss that Lake Borgne had, through those three resolutions, claimed that it possessed the rights to the LERD at issue in the present cases, including a right to remove soil from the Borgnemouth and Olivier Plantation landowners' properties. Defendant points to no reason why this finding by the Louisiana Court of Appeals was in error. Nor does the court see any reason, at this time, to second guess the findings of the

Louisiana Court of Appeals, which were based on a thorough review of the April 11, 1967, June 6, 1967, and May 13, 1969 resolutions, related documents, and Louisiana law. Because there is no evidence in the record at this time that demonstrates that either of the plaintiffs ever owned, claimed or controlled the LERD at issue prior to commencement of the state court <u>Borgnemouth</u> and <u>Olivier Plantation</u> cases, the court finds that plaintiffs have sufficiently alleged that the LERD at issue was Private, rather than Public Sponsor LERD.[13] Defendant's motion to dismiss plaintiffs' breach of contract claims in both of the above-captioned cases for failure to state a claim, therefore, fails.

<u>Plaintiffs' Claims for Indemnification</u>

In their complaints, plaintiffs allege, in the alternative, that the language of the Amended Cooperation Agreement constitutes an indemnity agreement and, therefore, defendant is required to indemnify plaintiffs for the entire amount of the judgments in the <u>Borgnemouth</u> and <u>Olivier Plantation</u> cases. Defendant argues that plaintiffs' indemnification claims allege the existence of an implied-in-fact contract, and that such an implied-in-fact contract is barred by law. As noted above, plaintiffs' counsel, however, conceded at oral argument that no implied-in-fact contract exists in the above-captioned cases. Plaintiffs allege that the government previously, and in contradiction to its current arguments, characterized the Amended Cooperation Agreement as an indemnification agreement in its "Third-Party Defendant's Memorandum on Jurisdiction" filed in the removal proceedings in the United States District Court for the Eastern District of Louisiana. Dkt. 60, <u>Olivier Plantation, LLC, Park Invs., Ltd., and Morning Park, Inc. v. Parish of St. Bernard, Lake Borgne Basin Levee District</u>, No. 09-3581 (E.D. La. June 3, 2010). According to the plaintiffs, "the Government is bound by its prior interpretation." At the end of oral argument, plaintiffs also argued, for the first time, and without elaboration, that the Army Corps' obligation in Article III.B of the Amended Cooperation Agreement to compensate the owners of Private LERD "in the name of the Public Sponsors" created an indemnification agreement. Although the complaints in both of the above-captioned cases state "the language in the Amended Cooperation Agreement constitutes an

---

[13] Additionally, while not dispositive, the stipulated facts reveal, as plaintiffs argue, that Lake Borgne and St. Bernard's actions in delivering the right of entry to the LERD at issue to the Army Corps were consistent with the process outlined in the in the Amended Cooperation Agreement for Private LERD. Under Article III.A.3 of the Amended Cooperation Agreement, the Public Sponsors were to provide right of entry to Private LERD by first "secur[ing] or caus[ing] to be secured an executive commandeering order or orders from the President of St. Bernard Parish, Louisiana, which said order or orders shall commander Private LERD, in accordance with powers set forth in La. R.S. 29:721, et seq.," and then "tender[ing] a right of entry to the Government for the Private LERD." As plaintiffs argue, this is the process plaintiffs followed when St. Bernard issued its September 29, 2005 Commandeering Order commandeering the LERD requested by the Army Corps and Lake Borgne its September 30, 2005 Authorization for Entry providing a right-of-entry to the Army Corps for that LERD.

agreement to indemnify St. Bernard and the Levee District for those expenses," neither party briefed the issue.

Initially, the court addresses plaintiffs' argument that the government, in contradiction to its current position, characterized the Amended Cooperation Agreement as an indemnification agreement before the United States District Court for the Eastern District of Louisiana. An examination of the government's "Third-Party Defendant's Memorandum on Jurisdiction," filed with the District Court for the Eastern District of Louisiana in <u>Olivier Plantation, LLC v. St. Bernard Parish</u> on June 3, 2010, which was attached to plaintiffs' responses to defendant's motions to dismiss in both of the above-captioned cases, indicates that the government did not, as plaintiffs allege, argue that the Amended Cooperation Agreement created an indemnity obligation in favor of the plaintiffs against the Government. Instead, the government's Memorandum characterized St. Bernard's third-party claim in the <u>Olivier Plantation</u> case against it as being one for indemnification, stating: "The Parish's claim that the United States is obligated to reimburse it for payments that it becomes obligated to pay despite the fact that its contracting partner, the United States, allegedly agreed to make those payments, is essentially a claim for indemnification." The government then proceeded to argue that such a claim properly should be filed in the United States Court of Federal Claims and, further, would be unripe because the underlying obligation had yet to be determined by the state court.[14] Defendant, thus, did not, as plaintiffs claim, characterize the Amended Cooperation Agreement as an indemnification agreement in its filings with the District Court for the Eastern District of Louisiana.

The court cannot, however, at this time, decide defendant's motion to dismiss with respect to plaintiff's alleged indemnity agreement. "Courts are rightfully loathe to allow a party to raise an issue at oral argument for the first time because there is a lack of notice to the court and adversary." <u>Res. Recycling Corp. v. United States</u>, 56 Fed. Cl. 612, 618 (2003) (citing <u>Cubic Def. Sys. v. United States</u>, 45 Fed. Cl. 450, 466–468 (1999)); <u>see also</u> <u>L-3 Global Comms. Solutions, Inc. v. United States</u>, 82 Fed. Cl. 604, 611 (2008) ("Plaintiff must not be allowed to advance new legal theories at oral argument, prejudicing defendant." (citing <u>Arakaki v. United States</u>, 62 Fed. Cl. 244, 246 n. 9 (2004) ("The court will not consider arguments that were presented for the first time in a reply brief or after briefing was complete." (citing <u>Novosteel SA v. United States</u>, 284 F.3d 1261, 1274 (Fed. Cir. 2002))))). Although plaintiffs allege in their complaints that "the language in the Amended Cooperation Agreement" constituted an indemnification agreement, they did not specify, either in their complaints or in their oppositions to defendant's motion to dismiss, which language in the Amended Cooperation Agreement allegedly did so. Instead, plaintiffs waited until the very end of oral argument to even remotely discuss for the first time their argument that their alleged indemnification agreement was created by the statement in Article III.B of the Amended Cooperation Agreement that "the Government in the name of the Public Sponsors, identify [sic] and provide [sic] just compensation to the owners of a compensable interest in the Private LERD." Not only should defendant should be afforded an opportunity to respond to this argument, but the

---

[14] This was ultimately the conclusion arrived at by the District Court. <u>See</u> <u>Olivier Plantation, LLC v. St. Bernard Parish</u>, 744 F. Supp. 2d at 588-89.

plaintiffs should be held to the task of putting flesh on their argument to allow defendant to respond. The court, therefore, defers its decision on whether to dismiss plaintiffs' indemnity claims pending further briefing by the parties, a schedule to be set by separate order.

## CONCLUSION

In both of the above-captioned cases, defendant's motions to dismiss plaintiffs' complaints are **DENIED IN PART** and **DEFERRED IN PART**. The court finds that plaintiffs' claims are timely and not barred by the statute of limitations. Additionally, the court finds that it has jurisdiction to award, if appropriate, the attorney's fees sought by plaintiffs.  The court also finds that plaintiffs have stated a claim for breach of contract in both of the above-captioned cases. With respect to plaintiffs' claims for breach of contract, defendant's motions to dismiss in both of the above-captioned cases are, therefore, **DENIED**. With respect to plaintiffs' indemnification claims, defendant's motions to dismiss in both of the above-captioned cases are **DEFERRED** pending further briefing by the parties.

**IT IS SO ORDERED.**

s/Marian Blank Horn
**MARIAN BLANK HORN**
**Judge**